**Peter & Judith PAPADOPLOS, Appellants**

**v.**

**SCHMIDT, RONCA & KRAMER, PC. and James R. Ronca, Esquire, Appellee.**

**Judith Papadoplos and Peter Papadoplos, Appellants**

**v.**

**Schmidt, Ronca & Kramer, PC. and James R. Ronca, Esquire, Appellee.**

Superior Court of Pennsylvania.

Submitted Feb. 7, 2011.
Filed May 5, 2011.

James F. Wiley, III, Philadelphia, for appellants.

Audrey J. Copeland, King of Prussia, for appellees.

BEFORE: STEVENS, P.J., ALLEN, J., and McEWEN, P.J.E.

OPINION BY STEVENS, P.J.:

Following the willful spoliation[1] of evidence during the discovery process, the trial court dismissed Appellants Judith and Peter Papadoplos' (collectively Appellants) civil complaint in its entirety. Appellants contend (1) the trial court erred in *sua sponte* dismissing this action on the basis of spoliation since the issue of spoliation was not raised by Appellees Schmidt, Ronca & Kramer, P.C., and James R. Ronca, Esquire (collectively Appellees), (2) the trial court abused its discretion in substituting its judgment for that of an expert as to the sufficiency of the computer disk, and (3) the trial court abused its discretion in

dismissing the complaint as to Mrs. Papadoplos in that there was no evidence she engaged in spoliation of evidence. We affirm the trial court's dismissal of Appellants' complaint with prejudice.

The relevant facts and procedural history are as follows: On April 30, 2002, Appellants commenced this action by filing a writ of summons against Appellees, and on October 30, 2002, Appellants, as husband and wife, filed a complaint against Appellees presenting a professional negligence claim. Specifically, Appellants alleged that, on January 25, 1997, Mrs. Papadoplos was seriously injured in an automobile accident, and Appellants originally retained John B. Mancke, Esquire, to pursue legal claims arising from the automobile accident. On September 12, 1997, while receiving medical treatment at the Polyclinic Hospital–Pinnaclehealth (hereinafter the hospital), Mrs. Papadoplos was seriously injured by a rehabilitation device, which was manufactured by Valpar International Corporation (hereinafter the manufacturer). Thereafter, Appellants retained Attorney Ronca of the law firm of Schmidt, Ronca & Kramer, P.C., who agreed to represent Appellants with regard to the litigation related to the automobile accident, as well as claims arising from the use of the rehabilitation device. Ultimately, Appellants reached a settlement with the other driver involved in the underlying automobile accident; however, Appellants never filed a timely lawsuit against the hospital or manufacturer with regard to the September 12, 1997 incident.

On October 23, 2000, Appellants and Attorney Ronca met to discuss the status of the case against the hospital and the manufacturer. At the meeting, Attorney Ronca advised Appellants that he had not

---

1. Spoliation relates to the loss or destruction of evidence. *See Creazzo v. Medtronic, Inc.,*

903 A.2d 24 (Pa.Super.2006).

filed any timely legal action against any of the potential defendants with regard to the injuries received by Mrs. Papadoplos at the hospital on September 12, 1997, and consequently, Appellants would be forever barred from pursuing any claims with regard thereto. As a result, with the assistance of James F. Wiley, Esquire, Appellants filed the instant professional negligence claim against Appellees.

Appellees filed preliminary objections, as well as an answer with new matter raising, *inter alia*, the defense of statute of limitations. That is, Appellees averred that it was undisputed that Mrs. Papadoplos suffered an injury in the hospital on September 12, 1997, and she had, as a matter of law, until September 12, 1999 to bring her cause of action against the hospital and manufacturer of the medical device. Moreover, the time period in which Appellants could sue Appellees for the alleged failure to file a lawsuit against the hospital and manufacturer within the two-year statute of limitations began to run as of September 13, 1999, barring application of the discovery rule. However, Appellants did not institute action against Appellees until April 30, 2002, when they filed their writ of summons. Accordingly, Appellees alleged that, if Appellants knew or had reason to know they had a potential claim for professional negligence as of September 13, 1999, their cause of action was precluded by the statute of limitations.

On January 17, 2003, Appellees served Appellants with interrogatories and requests for production of documents, which specifically included requests for written communications involving Appellants and Appellees, as well as any written memorialization reflecting any agreement by Appellees to provide legal services to Appellants.

On August 8, 2007, Mrs. Papadoplos was deposed. During her deposition, Mrs. Papadoplos testified that, during the October 23, 2000 meeting with Attorney Ronca, Mr. Papadoplos had made handwritten notes. Deposition of Judith Papadoplos dated 8/8/07 at 40. Appellees' attorney indicated that Appellees had never received the handwritten notes during discovery, and Appellants' attorney indicated that, if the notes were located, he would provide Appellees with a copy of the notes. *Id.* at 209–211.

Appellees subsequently filed a motion for a discovery conference, and following the conference, by order entered on January 15, 2008, the trial court indicated, *inter alia*, that "[Appellants] shall, within ten (10 days) of this Order, produce to [Appellees] any and all notes created and/or maintained by either Judith and/or Peter Papadoplos reflecting meetings, conversations and/or other communications with [Appellees.]" Trial Court Order filed 1/15/08 at 1. Thereafter, Appellants produced a partial response to Appellees' discovery request by providing Appellees with a five-page typewritten document dated October 23, 2000, and a single undated page of handwritten notes.

On September 11, 2008, Mr. Papadoplos, who is a retired police officer, appeared for a deposition, at which he testified, in relevant part, as follows upon examination by Appellees' attorney:

**Q:** Can you tell me, have you reviewed some documents or other tangible things in order to prepare for your deposition, this deposition?

**A:** I read one document yesterday. Other than that, no.

**Q:** What document was it that you read yesterday?

**A:** I read a memo that I wrote to myself concerning a meeting with Mr. Ronca that I had on—I think it was October 23rd, 2000.

**Q:** Where were you when you did that?

**A:** At home.

**Q:** Did you read it in a paper form?

**A:** Yes.

\* \* \*

**Q:** Have you kept any sort of log or journal or diary, other written account that describes or memorializes contacts or conversations that you've had with people, including but not limited to, Mr. Ronca, pertaining to this litigation?

Before you answer, let me just modify it and tell you I'm not interested about communications that you've had with Mr. Wiley. Do you understand what I'm asking?

**A:** When Mr. Ronca was our attorney, yes, I kept a log of when him and I spoke. But after that we haven't spoken. I haven't kept any log as to anything because there was nothing there [that] was was said between us.

**Q:** What do you mean when you say there was nothing there?

**A:** We haven't talked since probably the 23rd, I believe of October. I only keep records or I only make personal notes of the conversation that I would have had with my attorney or someone that was significant in the case, and I don't remember doing that with anybody else besides Mr. Ronca at the time when he was our attorney or now Mr. Wiley.

\* \* \*

**Q:** You mentioned earlier that you had kept some and made some notes of contacts or communications that you've had with Mr. Ronca while he was representing you and Mrs. Papadoplos. Is that accurate?

**A:** Yes, sir.

**Q:** Did you do that-withdrawn. For what period of time did you do that?

**A:** For as long as he was our attorney.

**Q:** And in what format or formats were those notes kept by you?

**A:** Most of the time on a computer: Just basically date, who I talked with, the time, what was stated, what we had to do, what he was doing, whatever our conversation dealt with.

**Q:** Where did you make entries into a computer? What computer, in other words, did you use for that?

**A:** It could have been one of three or four, whichever ones are in our house. I didn't do any work like that out of my house. In other words, I didn't use like a job computer or anything like that for this. It was either one of our computers at home. It could have been my son's, mine.

**Q:** What were the other two?

**A:** They were either laptops, old ones, new ones, or a desktop.

**Q:** The notes or entries that you made concerning contacts or communications that you had with health care providers, were they in any manner kept separately or in some segregated fashion from the notes that you made concerning contacts with Mr. Ronca?

**A:** I don't believe so, no.

**Q:** Was there some format that was common to both types of entries? And by both types, to be clear, I mean those that reflected contacts you had with health care providers of Mrs. Papadoplos and contacts that you had with Mr. Ronca.

**A:** I don't believe so. Again, I think it was basically just a date and then a time and just a note of what we were talking about or what we needed to do.

**Q:** Was there some particular computer file that collected these or to which you made these entries?

**A:** I think it might have been like Judy's Accident, or something like that, file.

**Q:** Do you know that, indeed, you made entries of the nature that we've been discussing by using more than one computer? Is that something that you're able to say with certainty?

**A:** I'm pretty sure.

**Q:** . . . . Was there any effort made by you to aggregate the entries made from one computer to those made by another? And if that doesn't apply, you can tell me that.

**A:** What do you mean by aggregate?

**Q:** Did the Judy's Accident file exist on a single computer or did it exist on multiple computers in the same format and form and substance?

**A:** It existed on multiple computers.

**Q:** In the same form, format and substance?

**A:** Yes, I tried to keep them the same.

**Q:** How did you do that?

**A:** By just transferring the same information or deleting the entire thing and—not reproducing but saving the time. Either way, whatever it allowed me to do at the time. I would try to keep them all consistent so there wasn't one—something here missing from there. So that's what I tried to do.

**Q:** Did you move the Judy's Accident file from one computer to another when circumstances caused you to think that was appropriate?

**A:** I don't think so. If you want to say move it, no. It might have been to save it. . . .

**Q:** At some point or points in time, there were multiple computer files, which so far we've characterized them, given them a name of Judy's Accident file.

**A:** Yes.

**Q:** And those multiple files existed on separate computers in your home?

**A:** Yes.

**Q:** That's accurate?

**A:** Yes, I would say that.

**Q:** . . . . Had you ever downloaded one of those files from a particular computer onto a disk and then uploaded it from that disk into another computer?

**A:** To save it, I may have[.] . . . . To me, you're asking me if I saved from a downloaded position something from a—even a portable hard drive or another disk to another computer, which I'm going to say yes because I may have even changed to a newer laptop when one broke down. And I had to take those files off there, put them on a separate hard drive and incorporate that hard drive to put it on the new computer. So I had to have done that to save the file.

**Q:** Do you have a recollection of when you did that most recently?

**A:** No. It might have been—no, I wouldn't even guess. I would have to look on the computer to see when the dates might have been. I couldn't tell you or find a receipt for when I bought another computer or something.

**Q:** Have you acquired a new computer, new to you anyway, in the last two years or so?

**A:** Yes.

\*      \*      \*

**Q:** Was there a computer in your home that was used by you to make entries concerning contacts that you had with either Mr. Ronca or one or more of Mrs. Papadoplos' health care providers which computer is no longer in your home?

**A:** I would say probably yes. Being 10 years now, I'll venture to say one computer somewhere is probably thrown away. And it's that—it was that old that it's gone by now.

**Q:** Can you tell me what computer it is that you think was in your home—

**A:** No.

**Q:** —at some point in the past and isn't anymore?

**A:** I was trying to think about which one it was, but right now I cannot think of which one. Something tells me that there's probably one at that age that I did get rid of because I know I have—I still have the hard drive to one. How long ago I threw it away, I'm not sure.

**Q:** Let me make sure I understand what you're telling me. When you say how long I've thrown it away, does it, as you've used that word, mean that a computer from which you've nonetheless retained the hard drive?

**A:** (Witness nods head negatively).

**Q:** Is that what you mean?

**A:** Um-hum.

**Q:** Is that a yes?

**A:** Yes.

**Q:** Let me be clearer. I apologize. At some point in the past, you disposed of a computer that had been in your home?

**A:** Yes.

**Q:** Yet, when disposing of that computer and prior to disposing of that computer, you nonetheless kept its hard drive?

**A:** Yes.

**Q:** Why did you do that?

**A:** Because you can never erase the information from it[.]

\* \* \*

**Q:** [Y]ou retained the hard drive?

**A:** Correct.

**Q:** And that's true even to today?

**A:** Yes, I think I still have it.

\* \* \*

**Q:** You had mentioned to me earlier that at least in some instances, you had handwritten notes and then made entries into a Judy's Accident file based upon some handwritten notes. Is that accurate?

**A:** If I had—if I was, say, like at the hospital or Mr. Ronca's office, I would probably jot down something that we were talking about that he would ask me, say, to do something; oh, you need to contact so-and-so. I'd write that down.

Then when I got home, I would put that down on the computer this is what we need to do, what date, so I could keep track of it, yes.

**Q:** So there were instances where you had handwritten notes?

**A:** Yes, occasionally.

**Q:** And based on those handwritten notes, you made some entry or entries—

**A:** Yes.

**Q:** —into an electronic file. And then did what with the handwritten notes after the entries—

**A:** Threw them away, destroyed them, whatever.

\* \* \*

**Q:** Mr. Papadoplos, back when I was asking questions of Mrs. Papadoplos in early August of last year, one of the things that I learned when asking her questions was her belief that, indeed, you had some notes that pertained to matters that are relevant to the litigation about which we're here today.

I will represent to you—I'm sure you're welcome to consult with your counsel on this subject—that prior to noticing either your deposition or Mrs. Papadoplos' deposition, I had made a request for all, and I emphasize all, such materials.

No such materials were produced to me prior to my beginning Mrs. Papadoplos' deposition in early August of last year. I renewed my requests multiple times to your counsel in writing following that deposition.

And to date—I mean that literally—up to this very minute, the only documents that I have been supplied—and that term in this context includes something that would exist in electronic format until one printed it onto a paper format—is a memorandum that is dated

October, I think, 23rd, 2000—It's a five-page document, at least in the format in which I have it—and a single page—I'll show you so there's no mystery—of handwritten notes that have been represented to me by your counsel to be your notes as such.

A: Okay. Yes, that's my writing.

Q: What I need for you to do, sir, is to go and get your notes and your laptop and come back. And we'll resume the deposition just as soon as you come back here this morning.

A: Okay. I don't—like I said, I could have notes. I may have, may not have notes. I don't know.

Q: You need to bring your file, your paper file[.] And to the extent—and you need to bring your laptop back here. Without any further discussion, it is simply unworkable that here we are a year after having asked for these materials—more than a year after having asked for these materials and we still don't have them.

\*    \*    \*

[APPELLANTS' COUNSEL]: You can't have the access to the computer because that computer contains sensitive material from the Department of Defense, et cetera, et cetera. Okay?

[APPELLEES' COUNSEL]: Why is that a problem? In other words—

[APPELLANTS' COUNSEL]: Because you can't have it, but he can download the file for you.

[APPELLEES' COUNSEL]: I'm not asking for access to Department of Defense files at all. What I'm asking is that Mr. Papadoplos retrieve his laptop and bring it here and open the file that is labeled Judy's Accident so that we can read those entries.

[APPELLANTS' COUNSEL]: I understand what you're asking. But he is not—because of the sensitive nature of the material that's on that particular computer, he is not going to just bring the computer in.

He will copy it. He will copy that file. And he's not going to go in and make changes or anything. But he can copy that file and bring you that file. But he's now go to—he had a surgery and everything and he's got a severe migraine right now. So he's not going to do it today.

[APPELLEES' COUNSEL]: That's not acceptable, counsel.

[APPELLANTS' COUNSEL]: That may be.

Deposition of Peter Papadoplos dated 9/11/08 at 16, 18–28, 30–31, 33–35, 40–41.

After further discussions, Mr. Papadoplos agreed to go to his home to retrieve, *inter alia,* his laptop computer, and he returned to finish the deposition. During the deposition, Mr. Papadoplos opened on his laptop the file entitled "Judy's Accident" and "Ronca case," and Appellees' counsel briefly reviewed the files. In reviewing the files, Appellees' counsel discovered an anomaly in that a file with notations about Mr. Papadoplos' discussion with Attorney Ronca had a modification date that pre-dated its creation date. *Id.* at 90–91. Mr. Papadoplos was unable to explain the anomaly. *Id.* Mr. Papadoplos then downloaded the files onto a clean disk. With regard to when files were created, Mr. Papadoplos testified as follows upon questioning by Appellees' counsel:

Q: Do you know when you first created the Judy Accident file, when that file began?

A: '97? After her accident we hired John Mancke.

Q: From the time that that file was begun up to now, up to today, in fact this minute, have you deleted any portions of it?

A: Probably not. I can't say for sure, but probably not.

\*    \*    \*

**Q:** If I were to ask you, Mr. Papadoplos, to download the contents of your laptop to an external hard drive, is that something that you're prepared to do?
**A:** No....

\* \* \*

**Q:** I'm struggling nonetheless here because it's important for me as counsel for the defendants in this case to know certain things that, without any disrespect intended towards you, you can't tell me.

Among them, for example, is—there's this file called Judy Accident file. I would like to know, because it's relevant, when that file came into existence. And I don't know of any way of getting to that information than looking at the date, the information that's on the hard drive of your laptop.

You've told me that, well, you can't do that.... But from my perspective, I both need and I believe have a good-faith basis and a right, of course under the rules, to get to that relevant information. And I don't know of a way to do that other than by having someone take a look at this.

Deposition of Peter Papadoplos dated 9/11/08 at 85, 106–109.

On November 19, 2008, Appellees filed a motion for sanctions alleging that, despite repeated discovery requests and a court order, Appellees discovered for the first time during Mr. Papadoplos' deposition that he maintains a computer file on his personal laptop entitled "Judy's Accident" and "Ronca Case," which constituted a contemporaneous recording of conversations Mr. Papadoplos had with Mr. Ronca. Mr. Papadoplos was unable to testify as to when he first created the "Judy's Accident" file. Appellees averred that "[t]he question of when Mr. Papadoplos first began to create and maintain documents in the "Judy's Accident" file, and particularly any documents pertaining to discussions Mr. Papadoplos may have had with Attorney Ronca concerning his wife's underlying personal injury claim, is critical to the [statute of limitations] defense of this action." Appellee's Motion for Sanctions filed 11/19/08 at 4. Specifically, Appellees averred that such evidence may yield relevant information concerning when Appellants knew or should have known that Appellees had not filed a lawsuit against the hospital and the manufacturer such that application of the discovery rule for statute of limitations purposes with regard to the professional negligence claim would be resolved. Due to Appellants' failure to make Appellees timely aware of and turn over the computer files, as well as other items, Appellees requested, *inter alia,* the trial court dismiss Appellants' complaint, in its entirety, with prejudice.

Appellants filed a response to Appellees' motion for sanctions, and on April 7, 2009 and July 23, 2009, the trial court held hearings on Appellees' motion for sanctions. At the conclusion of the hearings, by order entered on July 27, 2009, the trial court held, in relevant part, the following:

> [A]fter hearing, the Court is persuaded that there has been a substantial breach of the order of January 15, 2008 and generally the Rules of Discovery related to this matter.
>
> Therefore, the Court hereby awards to [Appellees'] counsel the sum of $3500 for his professional time and expenses.
>
> We further order that the digital evidence pertinent to this case shall be submitted to a forensic examiner in its natural state, and that the defense may submit a subsequent bill for consideration as an extension of this order.
>
> Additionally, a sanctions fee in the amount of $1000 is hereby jointly levied upon [Appellants] and their counsel.

\* \* \*

The Court is going to retain jurisdiction of this matter through its full implementation.

Trial Court Order filed 7/27/09 at 1. On August 18, 2009, the trial court filed an order indicating the directives set forth in the court's July 27, 2009 order must be completed by September 1, 2009.

On October 2, 2009, Appellants filed a motion for a protective order seeking a court order precluding discovery of Mr. Papadoplos' computer's hard drives, i.e., the digital evidence in its natural state. In the motion, Appellants revealed, *inter alia*, that "Mr. Papadoplos purchased new computers in early 2009 and destroyed the hard drives of his original computers as is recommended to prevent personal information from being discovered by unauthorized persons." Appellants' Motion for a Protective Order filed 10/2/09. Additionally, in a certified statement attached to the motion, Mr. Papadoplos averred that he is the individual in the family who maintains the computers, the family no longer possesses computers owned during the time Mr. Ronca represented Appellants, and Mr. Papadoplos destroyed the old computer's hard drives in the first quarter of 2008.

On October 5, 2009, Appellees filed a second motion for sanctions indicating that Appellants failed to comply with the trial court's July 27, 2009 order, which directed Appellants to submit the digital evidence in its natural state, i.e., provide the hard drives of Mr. Papadoplos' computers to Appellees for forensic examination. Appellees indicated that Appellants' dilatory conduct and repeated refusal to comply with the trial court's discovery orders "effectively robbed" Appellees of their ability to develop a potential statute of limitations

defense. Thus, Appellees requested the trial court dismiss Appellants' complaint in its entirety with prejudice.

On October 19, 2009, Appellees filed a motion for contempt in which Appellees asserted, *inter alia*, that, as indicated in prior court orders, they were entitled to discovery of Mr. Papadoplos' computers' hard drives in their native electronic format so that a forensic specialist could determine when the documents were created. However, in Appellants' motion for a protective order, and accompanying certified statement, Appellants revealed that Mr. Papadoplos destroyed his old computers' hard drives in either 2008 or 2009. Appellees specifically asserted "[p]erhaps mo[st] disturbing . . . is [Appellants'] previously undisclosed contention that the hard drives which [Appellees] seek to have examined have been destroyed by Mr. Papadoplos." Appellees' Motion for Contempt filed 10/19/09.

Appellants filed a response to Appellees' second motion for sanctions and contempt, and on January 22, 2010, the trial court held a hearing. By order entered on January 25, 2010, the trial court held, in relevant part, the following:

> [The] Court is persuaded by clear and convincing evidence that knowing and willful spoliation of pertinent evidence in this case would accrue to the potential benefit of the [Appellees] has been destroyed at the hands of [Appellants]; therefore, it is hereby ordered that [Appellants'] action against [Appellees] is hereby dismissed with prejudice.

Trial Court Order filed 1/25/10 at 1.

On February 18, 2010, Appellants filed praecipes to enter the orders filed on July 27, 2009, August 18, 2009, and January 25, 2010 as final for purposes of appeal. On February 22, 2010, Appellants filed two separate notices of appeal[2] and contempo-

2. This Court has consolidated the notices of appeal filed in this matter *sua sponte*.

raneously two separate Rule 1925(b) statements. On April 8, 2010, the trial court filed a detailed Rule 1925(b) opinion.

■ Appellants' first claim is that the trial court erred in *sua sponte* dismissing this action on the basis of spoliation since the issue of spoliation was not raised by Appellees. That is, Appellants contend that Appellees never sought dismissal under the theory of spoliation as it relates to the destruction of Mr. Papadoplos' computers' hard drives, and therefore, Appellants contend they were unduly prejudiced by lack of notice to defend. After a careful review of the record, we conclude that the issue of spoliation was not raised *sua sponte* by the trial court, Appellants were not unfairly surprised by the issue of spoliation, and Appellants had an adequate opportunity to defend.

For instance, Appellees' October 5, 2009 motion for sanctions presented at length the issue regarding Appellants' failure to provide Appellees' with Mr. Papadoplos' computers' hard drives. In the motion, Appellees averred that they first learned of Mr. Papadoplos' computer files at his September 11, 2008 deposition. They further specifically averred the following:

19. It has been over one (1) year since [Appellees] learned of the existence of Mr. Papadoplos' "Judy's Accident" file and the information contained therein pertaining to [Appellants'] communications with Mr. Ronca, information which Mr. Papadoplos neglected to disclose in spite of the service of discovery requests specifically seeking such information some five (5) years prior to Mr. Papadoplos' September 11, 2008 deposition.

20. [Appellees] continued to be prejudiced in their ability to defend this claim in that [Appellants'] dilatory conduct, and their counsel's conflicting representations as to [Appellants'] intentions with respect to complying with the court's July 23, 2009 and August 18, 2009 Orders, have effectively robbed [Appellees] of their ability to develop a potential statute of limitations defense.

21. In addition to the ongoing prejudice suffered by [Appellees], [Appellants'] current activities mark the third time [Appellants] have failed to comply with this Honorable Court's Orders, and [Appellants] are now in contempt of the Orders of January 15, 2008, July 23, 2008, and August 18, 2009. Such blatant disregard for this Court's directives is inexcusable and warrants dismissal of [Appellants'] claims with prejudice.

Appellees' Motion for Sanctions filed 10/5/09.

Additionally, Appellees' October 19, 2009 motion for contempt presented at length the specific issue of spoliation. In the motion, Appellees specifically contended the following:

28. [Appellants'] Motion for Protective Order asserts numerous bases upon which [Appellants] contend the entry of a protective order is warranted. Among such reasons, [Appellants] allege that the hard drive contains "proprietary and sensitive information which is the property of the U.S. Army," and that in early 2009, when Mr. Papadoplos purchased new computers, he destroyed the hard drives of his old computers, including the hard drive upon which the "Judy Accident" file was created.

29. [Appellants'] Motion for Protective Order is accompanied by a "Certified Statement" of Peter Papadoplos, wherein Mr. Papadoplos avers that he destroyed his old hard drives "in the first quarter of 2008," and that the hard drives contain "U.S. Army information which is the property of the U.S. Army," including items such as physical security documents, octagon alert procedure, and

CID motorcade and movement training documents.

\* \* \*

37. While [Appellees] acknowledge that they are in possession of a dis[k] containing <u>copies</u> of these documents, which dis[k] remains sealed and undisturbed, this copy does not allow [Appellees] to ascertain the date on which the documents were <u>created</u>. [Appellees] maintain that they are entitled to have the hard drive(s), in their native electronic format, examined by a forensic specialist to determine when these document were made. Both Mr. Papadoplos and Mr. Wiley were advised of [Appellees'] desire to submit Mr. Papadoplos' hard drive for analysis, and the basis for such analysis, during Mr. Papadoplos' September 11, 2008 deposition.

\* \* \*

41. Perhaps more disturbing than [Appellants'] efforts to revive their waived assertion of privilege is [Appellants'] previously undisclosed contention that the hard drives which [Appellees] seek to have examined have been destroyed by Mr. Papadoplos.

42. As a preliminary matter, [Appellants'] Motion is a prime example of [Appellants'] less than candid representations concerning the hard drives. In their Motion, they represent that Mr. Papadoplos destroyed all of his old hard drives "in early 2009." However, in Mr. Papadoplos' Certified Statement, . . . Mr. Papadoplos represents that he destroyed the hard drives "in the first quarter of 2008."

\* \* \*

44. Mr. Popodoplos was obviously in possession of an intact hard drive in September 2008 when he downloaded certain items from his laptop to an external hard drive. Additionally, Mr. Papadoplos testified during his [September 11, 2008] deposition that while he had replaced some of his older computers, he nevertheless retained their hard drives after disposing of the computers themselves. Thus, [Appellees] can only deduce that, as [Appellants] aver in their Motion, Mr. Papadoplos destroyed his laptop's hard drive in early 2009, after [Appellees] expressed their intention to seek judicial intervention for [Appellants'] failure to produce their hard drive pursuant to [Appellees'] original discovery requests and th[e] [trial] [c]ourt's subsequent January 15, 2008 Order.

45. Thus, [Appellants'] representation that the destruction of the hard drives occurred "before any issue was raised regarding information contained on [Appellants'] computers" is patently false.

\* \* \*

46. If indeed Mr. Papadoplos destroyed his hard drives in early 2009 as his Motion contends, such destruction not only post-dates the [trial] [c]ourt's January 15, 2008 Order, but it further post-dates Mr. Popodoplos' September 11, 2008 deposition, during which [Appellees] advised [Appellants'] counsel that they desired to have the hard drives examined by a forensic expert, as well as [Appellees'] November 19, 2008 Motion for Sanctions, wherein [Appellees] specifically requested that they be permitted to have Mr. Papadoplos' hard drives examined, in their native electronic format, by a forensic expert to determine the dates of creation of the documents contained in the "Judy Accident" file.

47. Regardless of when the hard drives were destroyed, [Appellees] would emphasize that [Appellants] have <u>never</u> represented that the hard drives which [Appellees] sought to examine had been destroyed until their October 22, 2009 Motion for Protective Order, in

spite of the fact that, according to [Appellants'] Motion, the hard drives were destroyed nearly one (1) year ago.

\*    \*    \*

52. [Appellants'] well-documented history of discovery violations and defiance of court orders has now culminated in their acknowledgement that they destroyed discoverable evidence in spite of their ongoing litigation and their obligation to produce such evidence to [Appellees]. [Appellants] have magnified their culpability by neglecting to advise the Court and defense counsel of their destruction of the hard drive.

53. [Appellants] are unquestionably in contempt of court by virtue of their ... intentional destruction of discoverable materials during the pendency of this litigation.

WHEREFORE, [Appellees] respectfully submit that this Honorable Court enter an Order holding [Appellants] in contempt of this Court; dismissing [Appellants'] claims against [Appellees] with prejudice, and further awarding all such other relief[.]

Appellees' Motion for Contempt filed 10/19/09 (underlining in original) (citations to record omitted).

Finally, during the January 22, 2010 hearing, Appellees specifically presented the issue of Appellants' recent omission that Mr. Papadoplos destroyed the computers' hard drives in either 2008 or 2009, Appellees argued that such destruction was a clear disregard of the trial court's orders, and Appellees specifically requested dismissal of Appellants' complaint as a sanction. N.T. 1/22/10 at 3–14, 31–32, 36.

As is evident, Appellees requested that Appellants be held in contempt for willfully disobeying the court's discovery order and, in fact, destroying evidence that was subject to the court's order. Appellees further requested dismissal of Appellants' claim with prejudice as a sanction for such spoliation of the evidence. *See Creazzo v. Medtronic, I25-242917nc.*, 903 A.2d 24 (Pa.Super.2006) (sanction of dismissal of claims was not an abuse of discretion where evidence was lost, i.e., where spoliation of medical device occurred); *Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division*, 781 A.2d 1263 (Pa.Super.2001) (indicating that dismissal of complaint may be appropriate sanction for spoliation of evidence). Thus, as it is clear that Appellees specifically raised the issue of spoliation and requested the sanction of dismissal, and the trial court held a hearing on the motion at which Appellants had the opportunity to present evidence contrary to the assertions made by Appellees, we conclude the trial court did not *sua sponte* present the issue of spoliation, Appellants were not unfairly surprised, and Appellants had an adequate duty to defend. Therefore, Appellants' first issue is meritless.

■ Appellants' next claim is that the trial court abused its discretion in substituting its judgment for that of an expert as to the sufficiency of the computer disk. Specifically, Appellants suggest that, at the January 22, 2010 hearing, they requested an expert to testify as to "what information may be obtained from data that h[a]s been copied including the 2003 backup disk which was provided to counsel," and instead, "the court has impermissibly acted as the expert witness as to the data that could be recovered from backup copies of a hard drive." Appellants' Brief at 18.

At the January 22, 2010 hearing, the following relevant exchange occurred between Appellants' counsel and the trial court:

[APPELLANTS' COUNSEL]: When—I—I didn't understand that there was any question about the computers themselves until the deposition of Mr. McMa-

hon—of Mr. Papadoplos. Now, the issue—you're talking—going in here about the creation and that sort of thing is what happens with the computer. And I think a computer expert is the one who should tell you this, but when—when you copy something from one computer to another, it will show the creation of that date. The last modified date, to my understanding, would be the last time that document was opened and a change made to it.

**THE COURT:** Let me—let me enlighten you. I build from scratch computers and have been engaged in that hobby for approaching 20 years. I'm talking about from bare components. I have a significant working understanding, not only of the hardware, but of the software, including right down to the—what would be called kernel, K–E–R–N–E–L, level of the operating system and how it manages its file indexing and retrieval systems and many, many, many, many other attendant processes that undertake when you push the button and turn it on.

I also understand both the mechanical, electromechanical, and digital processes that undertake when you push the button and turn it on.

I also understand both the mechanical, electromechanical, and digital processes that occur on a hard drive, which is the primary storage medium in modern day computers, albeit there are removable storage of some kinds used a little bit, but not much on hard—or—excuse me—on laptops. So I have a better-than-average understanding of all of this.

I also know how data on a hard drive is digitally encoded, such that with proper retrieval tools one can see a multitude of things about such data that would not be otherwise viewable by someone accessing that hard drive.

Indeed, I have seen and been witness to the retrieval of information that had been intentionally overwritten by any number of different scrubbing programs to hide its existence and/or digitally encrypt it with extremely sophisticated algorithms to cause it to be not available to the average user.

There's not too much about personal computers, and even the home networking systems that are presently in use in this country, that I don't understand about. So we don't need to really go into all of that. The Court has a full grasp of those matters. Now, of course, if there is some specialized information that a, quote, computer expert, as you denominated the person, might illuminate for us, we're always glad to add to our body of knowledge about these things, because it is of significant interest to us, personally and professionally, inasmuch as we also give counsel to our colleagues on the bench about certain matters attendant to the Court's own secure system.

N.T. 1/22/10 at 17–20.

From the above excerpt, we conclude that Appellants never specifically requested that an expert be permitted to testify. In any event, as the trial court stated, in relevant part, in its opinion regarding this issue:

> [Appellees] repeatedly requested the hard drive(s), in its native electronic format, to be examined by a forensic specialist to determine when these documents were made. Now we will never know when the documents were created, as Mr. Papadoplos has willfully destroyed the only evidence that would provide the answers to [Appellees'] questions. [Appellants] had ample opportunity to present expert evidence that the [disk] was a sufficient substitute of the data on the hard drive, including

the true creation date and date(s) of any revisions or editing, but did not. [Appellants] stated that the hard drive was still intact at the time of Mr. Papadoplos' deposition of September 11, 2008. [Appellants] had sufficient notice that evidence from the hard drive(s) must be produced from the time that [Appellees] served their original discovery request to the the date of Mr. Papadoplos' September 11, 2008 deposition. The dismissal of this matter was not a result of this Court's supposed substitution of its computer knowledge for that of an expert, but alternately of [Appellants'] calculated and willful failure to comply with this Court's Orders and discovery requests. Therefore, the Sanction of Dismissal was appropriate.

Trial Court Opinion filed 5/26/10 at 11–12.

■ Appellants' final claim is that the trial court abused its discretion in dismissing the complaint as to Mrs. Papadoplos in that there was no evidence she engaged in spoliation of evidence. Appellants' entire argument in this regard is as follows:

There has been no showing of any conduct engaged in by Judith Papadoplos. The transcript of her entire deposition testimony has been included in the reproduced record because a reading of this transcript clearly shows the disability under which Judith operates. It is abundantly clear that she was not involved with anything having to do with computers or the request to produce. Given that she is the primary Plaintiff in this action and her husband is a party on a consortium claim[,] [i]t is patently clear that the dismissal of her claims does not do justice.

Appellants' Brief at 18–19.

We find Appellants' cursory presentation without citation to any pertinent legal authority to be waived. It is a well settled principle of appellate jurisprudence that undeveloped claims are waived and unreviewable on appeal. *See In re Estate of Johnson*, 970 A.2d 433, 439 n. 9 (Pa.Super.2009) (holding the failure to develop an argument in the brief results in waiver on appeal).

For all of the foregoing reasons, we affirm the dismissal of Appellants' complaint with prejudice.

AFFIRMED.